**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

MARK A. BEILBY SR., as Administrator for
the Estate of Mark. A. Beilby, Jr.,

            Plaintiff,

                 -v-

JEFFREY MILLER,

            Defendant.

6:23-CV-328 (AJB/CBF)

**Hon. Anthony Brindisi, U.S. District Judge:**

**<u>DECISION and ORDER</u>**

## I.    INTRODUCTION

On March 13, 2023, plaintiff Mark Beilby Sr. ("plaintiff"), acting as Administrator for the Estate of Mark A. Beilby, Jr., filed this action under 42 U.S.C. § 1983 and state law against the State of New York and New York State Police Trooper Justin Miller ("Miller"), who was initially named erroneously as "Jeffrey Miller."

This suit arises out of the tragic death of plaintiff's son, Mark A. Beilby Jr. (the "decedent"), on December 22, 2021.  Plaintiff alleges that, on that date, Miller unlawfully shot and killed the decedent while responding to a domestic incident at the decedent's mother's residence.  Dkt. No. 1.  Plaintiff initially asserted a § 1983 claim for excessive force and state law claims for negligence and battery against Miller and the State of New York.  *Id.*  Thereafter, plaintiff voluntarily dismissed his claims against the State of New York, Dkt. No. 20, and the parties conducted a period of discovery on plaintiff's claims against Miller.

On July 31, 2025, Miller moved for summary judgment on plaintiff's claims, arguing primarily that he is entitled to qualified immunity from plaintiff's federal and state law claims.

Dkt. No. 53-13.  The motion was fully briefed, Dkt. Nos. 56, 58, and the Court heard oral

argument on January 16, 2026.  Decision was reserved.

## II.    BACKGROUND

Pursuant to Local Rule 56.1, the following facts are drawn from the parties' statements of

material facts and the attached exhibits and are undisputed unless otherwise noted.

### A.  Miller's Background with the New York State Police

Miller joined the New York State Police in 2016.  Dkt. No. 57 ("Pl.'s Add'l SMF")[1] ¶ 6.

As part of his training, Miller completed a six-month police academy, followed by two and a half

months of field training.  Dkt. No. 53-1 ("Mahoney Decl."), Exh. A, Dkt. No. 53-2[2] ("Miller

Dep.") at 23–24, 33.  The police academy trained Miller in the use of firearms and instructed him

on the law pertaining to the use of force—including the use of deadly force.  *Id.* at 24.  After

Miller graduated from the police academy, he was assigned to Troop C.  *Id.* at 23.  Miller

participated in annual refresher training on the use of force and re-qualified yearly to use his

division-issued firearm.  *Id.* at 21, 31–33.

### B.  Past Interaction with the Decedent

Miller was familiar with the decedent prior to December 22, 2021, the date of the subject

incident.  Dkt. No. 53-12 ("Def.'s SMF") ¶ 13.  Earlier that year, Miller gave the decedent a

"courtesy transport" from the New York State Police barracks to town court.  *Id.*; Pl.'s Add'l

SMF ¶ 17.  The decedent was not under arrest or in custody at the time of the transport, and

Miller did not know why he had been at the barracks.  Pl.'s Add'l SMF ¶¶ 17–18.  Miller

---

[1] Although plaintiff's responses to Miller's statement of material facts and plaintiff's statement of additional material facts are contained in the same document, the Court cites plaintiff's responses to Miller's statement of material facts as "Pl.'s Resp. SMF" and plaintiff's statement of additional material facts as "Pl.'s Add'l SMF" to avoid any confusion.

[2] Pagination to the exhibits corresponds to the electronically generated CM/ECF headers.

recalled that the decedent was quiet during the ten-mile ride.  *Id.*  ¶¶ 20–21.  After that, Miller

had no contact with the decedent until the incident.  *Id.* at 22.

At some point between the courtesy transport and the date of the incident, Miller learned

that the decedent had assaulted state trooper Rosalita Flowers ("Flowers").[3]  Pl.'s Add'l SMF

¶ 23.  According to Miller, either Flowers or someone else told him that the decedent struck and

injured Flowers during an altercation.  Miller Dep. at 56–57.  Sometime prior to the incident

Miller had also become aware "that 'there had been multiple mental health calls involving [the

decedent].'"  Pl.'s Add'l SMF ¶ 30 (quoting Miller Dep. at 62).[4]

### C.  December 22, 2021

At 6:00 p.m. on December 22, 2021, Miller started a 12-hour shift.  Pl.'s Resp. SMF ¶ 16.

At around 7:00 p.m. that "evening[,] . . .  Miller . . . was dispatched to a call regarding a domestic

dispute at 3 Lyons Street, Unadilla, New York, following a 911 call."  Miller Dep. at 65; Def.'s

SMF ¶ 1.  The dispatcher indicated that someone involved in the dispute had a knife. Pl.'s Add'l

SMF ¶ 33.  Miller was by himself in his marked patrol vehicle when he received the dispatch.

Miller Dep. at 67.  He had his division-issued firearm and a taser with him, both affixed to his

duty belt.  Def.'s SMF ¶¶ 14–15.  The dispatcher directed Miller and another state trooper, Laura

Hoffman ("Hoffman"), to respond to the residence.  Pl.'s Add'l SMF ¶ 34.  According to Miller,

it was customary for two cars to be dispatched to a domestic dispute.  Miller Dep. at 73–74.

---

[3] Flowers has also been referred to as "Rosalie Flower" and "Rosalie Flowers."  *See* Def.'s SMF ¶ 12; Miller Dep. at 58; Mahoney Decl., Ex. B, Dkt. No. 53-3 ("Johnson Dep.") at 26.

[4] Defendant's statement of material facts details another earlier incident involving the decedent that resulted in a mental health commitment pursuant to New York Mental Hygiene Law § 9.41.  Def.'s SMF ¶¶ 8–11.  But, as plaintiff points out, Miller testified that he had no knowledge of the particulars of that incident.  Miller Dep. at 62–63.

Miller was the first to arrive on scene.  Miller Dep. at 73–74.  After exiting his patrol vehicle, he spoke with Maureen Leblanc ("Leblanc"), the decedent's mother, and Christopher Craft ("Craft"), a friend of Leblanc's, outside the residence.  Def.'s SMF ¶ 3; Pl.'s Add'l SMF ¶ 37.  Craft told Miller that the decedent was inside the residence with a butter knife.  Mahoney Decl., Ex. G, Dkt. No. 53-8 ("Miller BWC")[5] at 19:15:19–22; Pl.'s Add'l SMF ¶ 37.  Craft also made reference to the decedent's mental health status, and Miller indicated that he was familiar with the decedent.  Miller BWC at 19:15:21–22; Pl.'s Add'l SMF ¶ 48.  Leblanc approached the two and told Miller that he "might want to get in there" because the decedent was inside the residence "cutting himself up" with a steak knife.  Miller BWC at 19:15:24–34; Def.'s SMF ¶ 5; Pl.'s Add'l SMF ¶¶ 37, 44.  Craft added that, before Miller arrived, he had to "knock [the decedent] down" once and Leblanc tried to hold the decedent down.  Miller BWC at 19:15:40–19:15:45; Pl.'s Add'l SMF ¶ 38.

Leblanc also informed Miller that the decedent had been in a "facility" in Oneonta, but that the workers there allowed him to leave.  Miller BWC at 19:15:46–53.  Then, she provided Miller with a key to her apartment, which was located on the first floor of the residence.  Pl.'s Add'l SMF ¶ 43.  At some point, Miller was also made aware that the decedent was alone inside the apartment.  *Id.* ¶ 44.

Initially, Miller expressed concern that he may "stir" the situation by "barging in," but after considering "the totality of the situation, [he] determined that it was not the safest action to wait for backup."  Miller Dep. at 72.  Holding his police-issued firearm, Miller unlocked the door and leaned into the living room area of Leblanc's apartment, where he encountered the decedent,

---

[5] Pinpoint citations to Miller's body worn camera footage correspond with the timestamp superimposed on the upper right-hand corner of the footage.

who was standing in front of a doorway at the far end of the adjacent kitchen.  Def.'s SMF ¶ 20[6];

Miller BWC 19:17:32–36.  The following screenshot, excerpted from Miller's body worn camera

footage, depicts the moment when Miller entered the apartment and encountered the decedent:



Miller BWC at 00:19:18:02.

Though the parties dispute whether the decedent had a butter knife, a steak knife, or some

other sharp kitchen knife, it is undisputed that the decedent was holding a knife with both hands

on the grip and the blade pointed towards himself.  Miller Dep. at 89 ("He had a sharp knife

pulling it to his chest . . . I believe at one point, he moved it up to his neck."); Def.'s SMF ¶ 23

("The [d]ecedent did indeed possess a kitchen knife and was moving it around between his chest

and his neck."); Pl.'s Add'l SMF ¶ 49.  Miller did not observe any blood on or around the

decedent from where he was positioned.  Miller Dep. at 87.

Upon Miller's entry, the "[d]ecedent was visibl[y] agitated and repeatedly stated . . .

'shoot me or I'll kill myself.'"  Def.'s SMF ¶ 22.  Miller told the decedent to put the knife down

---

[6] There are two consecutive paragraphs in defendant's statement of material facts numbered "20."  Def.'s SMF at p. 5.  This citation refers to the first.

and attempted to speak with the decedent about what had upset him, but the decedent refused. Miller BWC 19:18:10–25; Pl.'s Add'l SMF ¶ 52; Def.'s SMF ¶ 24. Miller also told the decedent that he would not discharge his firearm if the decedent put the knife down. Miller BWC at 19:18:53–57. Miller later testified that he was trained to "attempt to negotiate . . . and de-escalate" when confronted with a subject who is armed with a knife and expressing suicidal ideations, but not threatening the officer. Pl.'s Resp. SMF ¶ 11. As Miller continued his attempts to de-escalate the situation, the decedent began to cry and told Miller that he wanted to be dead. Miller BWC 19:19:21–57. The decedent also stated: "I'm on probation," and "I can't do this anymore." *Id.* at 19:20:25–59; Pl.'s Add'l SMF ¶ 51.

Then, just over three minutes into the interaction, the decedent looked up suddenly in Miller's direction and raised the knife over his head in his right hand. Miller BWC 19:21:10–12. Miller immediately drew his firearm in the decedent's direction and stated: "Don't do it, don't fucking do it," before quickly firing two shots in the decedent's direction. *Id.* at 19:21:12–18; Def.'s SMF ¶ 25. Neither struck the decedent. Def.'s SMF ¶ 26.

When Miller drew his firearm, his body worn camera became at least partially obstructed by his arms for the remainder of the incident. Pl.'s Add'l SMF ¶ 56. Consequently, the decedent is not visible in the footage at the time when the first shots were fired. *Id.* According to Miller, the decedent had "raised [the knife] in a menacing fashion above his head," pointed it towards Miller, and moved closer to Miller. Miller Dep. at 156. Plaintiff disputes that the decedent moved towards Miller, *see* Pl.'s Resp. SMF ¶ 25, because Miller also testified that the decedent was 15 feet away from him when he entered the apartment and when he fired the first shot. Miller Dep. at 85–86 ("Q. And how far was Mr. Bielby from you when you first entered the apartment? A. Approximately, 15 feet . . . Q. And before you fired the first shot, how close did

Mr. Bielby get to you? A. Approximately, 15 feet."). Miller could not recall seeing the decedent's feet move and was unsure of how much closer the decedent got to him, but he believed that the decedent was "more towards the middle" of the kitchen after he approached. *Id.* at 156, 105. Miller also claimed that the decedent threw the knife at him, but plaintiff disputes this, claiming instead that decedent threw the knife at the ground in compliance with Miller's orders to drop the knife. Pl.'s Resp. SMF ¶ 25.

After Miller fired the first round of shots, he advanced into the living room area where he radioed in "shots fired." Miller BWC at 19:21:12–20. Miller continued to point his firearm towards the kitchen and repeatedly instructed the decedent not to move, to which the decedent responded: "I will set myself on fire." *Id.* at 19:21:20–30. Seconds later, Miller appeared to take a quick step back, as if something was thrown at him, and the decedent, again, stated "shoot me, or I'll kill myself." *Id.* at 19:21:34–44. Miller instructed the decedent to put his hands up, but the decedent refused and told Miller to kill him. *Id.* at 19:21:44–48.

After that, according to Miller, the decedent "went further into the kitchen area[,] . . . grabbed another knife," and came toward him with the new knife raised. Dkt. No. 53-11 ("Miller Decl.") ¶ 16. Then, Miller yelled: "Don't! Put it down, put it down, put it—" and fired three shots at the decedent in rapid succession. Miller BWC at 19:22:01–03. All three "struck [the] [d]ecedent in his center mass—in his chest and stomach." Def.'s SMF ¶ 30.

Around 47 seconds elapsed between the initial set of two shots and the final set of three shots. Miller BWC at 19:21:12–15; 19:22:02–03. The decedent was not visible in the body worn camera footage during that period, including the moments immediately prior to the fatal shots. Miller Dep. at 154–55. Miller later testified that the decedent was approximately 15 feet away from him when he fired the fatal shots, but he did not take any measurements to confirm

his approximation. *Id.* at 153–55. According to Miller, he was trained that an officer may use deadly force when threatened by an individual with a knife where the individual is within 21 feet of the officer because, at that distance, the individual poses an imminent threat of injury or death. *Id.* at 26–29.

After the decedent was struck, Miller claims that he dropped the knife he was holding, grabbed his chest, and fell backwards onto the kitchen floor. Miller Decl. ¶ 17; Miller Dep. at 152. Miller instructed the decedent not to move and proceeded into the kitchen. Miller BWC at 19:22:12–18; Miller Dep. at 124. At that point, the decedent became visible in Miller's body worn camera again. Miller BWC at 19:22:17–18. The decedent was lying on his back horizontally along the far wall of the kitchen with his head toward the right side. *Id.*

Miller approached the decedent with handcuffs, grabbed his left wrist, and instructed him to roll over. Miller BWC at 19:22:26–30. The decedent was unable to roll over on his own, so Miller rolled the decedent onto his stomach and placed him in handcuffs. Miller BWC at 19:22:35–59. Once in handcuffs, Miller called for emergency medical services. Miller BWC at 19:23:00–02. Nearly a minute later, Hoffman arrived on scene. Miller BWC at 19:23:59.

Miller and Hoffman applied pressure to the decedent's wounds and administered multiple rounds of chest compressions until emergency medical personnel arrived. Miller BWC at 19:24:30–19:33:00. During that time, Sergeant Glen Johnson ("Johnson"), arrived on scene and asked to speak with Miller outside the residence. Miller Dep. at 149–50. Miller recalled telling Johnson that, "the [decedent] attempted to kill [him] and [he] discharged [his firearm], striking [the decedent]." *Id.* at 45.

After speaking with Miller, Johnson retrieved a camera from his car, re-entered the residence, and took photos of two knives located on the floor of the residence. Johnson Dep. at

58–59.  According to Johnson, there was one knife in the kitchen near the doorway to the living room, and a second knife in the living room area.  *Id.*; *see also* Mahoney Decl., Ex. H, Dkt. No. 53-9; Miller BWC at 19:32:54–19:33:01.

At some point, emergency medical personnel transported the decedent to a nearby hospital.  Miller Dep. at 151–52.  Despite their efforts, the decedent died from his injuries later that night.  Mahoney Decl., Ex. I, Dkt. No. 53-10.

## III.    LEGAL STANDARD

The entry of summary judgment is appropriate if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A fact is "material" if it "might affect the outcome of the suit under the governing law."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A dispute over a material fact is considered "genuine" when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Id.*  In conducting this analysis, the court must view the facts and draw all reasonable inferences in the light most favorable to the non-movant.  *Id.* at 255.  Even so, there is no genuine issue for trial "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party."  *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 588 (1986).

## IV.    DISCUSSION

Plaintiff asserts a § 1983 excessive force claim against Miller, along with related state law negligence and battery claims.  Dkt. No. 1 ("Compl.") at ¶¶ 33–59.  Miller has moved for summary judgment on all of plaintiff's claims on qualified immunity grounds.  Dkt. No. 53-13 ("Def.'s Mem.").  Plaintiff opposes.  Dkt. No. 56 ("Pl.'s Opp.")

## A.  Excessive Force

Miller argues that plaintiff's § 1983 excessive force claim "is barred by the doctrine of qualified immunity."  Def.'s Mem. at 10.  In opposition, plaintiff contends that genuine disputes of material fact preclude judgment as a matter of law on qualified immunity grounds.  Pl.'s Opp. at 13–20.

### 1.  Qualified Immunity

"The doctrine of qualified immunity shields officials from civil liability so long as their conduct 'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'"  *Mullenix v. Luna*, 577 U.S. 7, 11 (2015) (quoting *Pearson v. Callahan*, 555 U.S. 223, 231 (2009)).  "Because the focus is on whether the officer had fair notice that [his] conduct was unlawful, reasonableness is judged against the backdrop of the law at the time of the conduct."  *Kisela v. Hughes*, 584 U.S. 100, 104 (2018) (quoting *Brosseau v. Haugen,* 543 U.S. 194, 198 (2004)).

"The first step in assessing the [reasonableness] of [Miller]'s actions is to determine the relevant facts."  *Scott v. Harris*, 550 U.S. 372, 378 (2007).  Then, viewing the relevant facts in the light most favorable to plaintiff, the Court must determine whether Miller's conduct violated the decedent's clearly established statutory or constitutional rights under then-existing law.

### i.  Relevant Facts

To ascertain the facts material to a qualified immunity defense in the excessive force context, courts look to "what would have been known to or believed by a reasonable officer in the defendant's position."  *Outlaw v. City of Hartford*, 884 F.3d 351, 367 (2d Cir. 2018).  Last term, in a case called *Barnes v. Felix*, the Supreme Court made clear that courts cannot "'narrow' the totality-of-the-circumstances inquiry to focus on only a single moment."  605 U.S. 73, 83 (2025).  Instead, courts must look "at any relevant events coming before."  *Id.*

According to plaintiff, there are genuinely disputed issues of material fact with regard to the circumstances known to or reasonably perceived by Miller at the times he used deadly force. Pl.'s Opp. at 15.  Miller disagrees.  Dkt. No. 58 ("Def.'s Reply") at 6–7.

"[E]arly resolution of the qualified immunity defense is encouraged, and a defendant may properly move for summary judgment dismissing the plaintiff's claim on that basis where there are no genuinely disputed factual issues material to the defense."  *Munafo v. Metro. Transp. Auth.*, 285 F.3d 201, 210 (2d Cir. 2002).  But if there is such a dispute, summary judgment on qualified immunity grounds is not appropriate.  *Zellner v. Summerlin*, 494 F.3d 344, 368 (2d Cir. 2007).

First, plaintiff contends that Miller used deadly force on three separate occasions.  *See* Pl.'s Add'l SMF ¶¶ 57, 61, 70.  According to plaintiff, Miller fired a single shot at the decedent five seconds before the initial two shots.  *Id.*; *see also* Pl.'s Opp. at 15 ("The video evidence shows that Miller shot the decedent on three separate occasions.").  Plaintiff purportedly relies on the body worn camera footage and Miller's testimony in support of this contention.  Pl.'s Add'l SMF ¶ 61 (citing Miller Dep. at 117).  According to Miller, he did not fire any shots before the initial two-round volley.  Dkt. No. 58-1, ("Def.'s Reply SMF") ¶¶ 57, 61.

At the summary judgment stage, "unsupported allegations do not create a material issue of fact."  *Weinstock v. Columbia U.*, 224 F.3d 33, 41 (2d Cir. 2000).  Plaintiff's allegation concerning the first shot is unsupported by plaintiff's citation, *see* Miller Dep. at 117, and flatly contradicted by the body worn camera footage, *see* Miller BWC at 19:21:08–21.  Accordingly, this allegation is insufficient to create a genuine dispute of fact.

Second, plaintiff argues that a reasonable jury could conclude that the decedent had not thrown the first knife at Miller, but rather at the floor, in an effort to comply with Miller's orders to put down the knife.  Pl.'s Opp. at 2.  Miller disagrees.  Def.'s SMF ¶ 24.

As plaintiff correctly notes, at the summary judgment stage, "courts are required to view the facts and draw reasonable inferences 'in the light most favorable to [the non-movant].'" *Scott*, 550 U.S. at 378 (quoting *United States v. Diebold, Inc.*, 369 U.S. 645, 655 (1962)).  "In qualified immunity cases, this usually means adopting . . . the plaintiff's version of the facts." *Scott*, 550 U.S. at 378.  Further where, as here, "the witness most likely to contradict the police officer's story—the person shot dead—is unable to testify," the Second Circuit has made clear that:

> the court may not simply accept what may be a self-serving account by the police officer.  Rather, the court must also consider circumstantial evidence that, if believed, would tend to discredit the police officer's story, and consider whether this evidence could convince a rational factfinder that the officer acted unreasonably.

*Callahan v. Cnty. of Suffolk*, 96 F.4th 362, 369 n.9 (2d Cir. 2024) (quoting *O'Bert ex rel. Est. of O'Bert v. Vargo*, 331 F.3d 29, 37 (2d Cir. 2003)); *see also Soto v. Gaudett*, 862 F.3d 148 (2d Cir. 2017) (noting same).

Even so, "facts must be viewed in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts."  *Scott*, 550 U.S. at 380.  "Metaphysical doubt, conjecture, or surmise cannot establish such dispute and defeat the motion."  *Halpern v. F.B.I.*, 181 F.3d 279, 287 (2d Cir. 1999).  Accordingly, for the Court to consider circumstantial evidence tending to discredit Miller's story, some basis for that evidence must appear in the record.

Plaintiff points to evidence that a knife was found in the kitchen—"never anywhere near Miller"—in support of his theory that the decedent threw the knife at the ground, rather than at

Miller.  Pl.'s Resp. SMF ¶ 25.  Specifically, plaintiff relies on Johnson's testimony that he only recalled taking a photo of a knife in the doorway between the kitchen and the living room. Johnson Dep. at 48.

Although Johnson later remembered finding and photographing a second knife in the living room area, Def.'s SMF ¶ 36 (citing Johnson Dep. at 58), the Court "must disregard all evidence favorable to the moving party that the jury is not required to believe," *Kaytor v. Electric Boat Corp.*, 609 F.3d 537, 545 (2d Cir. 2010).

Be that as it may, the "court may not . . . consider the record in piecemeal fashion . . . rather it must 'review all of the evidence in the record,'" *Kaytor*, 609 F.3d at 545 (quoting *Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 150 (2000)).  Even assuming a jury discredited Johnson's later testimony and found that he only photographed one knife, that finding would not undermine or otherwise place in dispute the record fact that two knives were photographed at the scene immediately after the incident, including one just behind where Miller was standing when he fired the initial shots.  Mahoney Decl., Ex. H at 1–2.

To adopt plaintiff's theory, the Court would have to disregard: (1) photos from the Office of the Attorney General's investigation depicting a second knife in the living room area near where Miller was standing when he fired the first shots, Mahoney Decl., Ex. H at 1–2; (2) the absence of a knife on the floor between Miller and the decedent during the period between the first and second set of shots, Miller BWC 19:21:53–55; and (3) body worn camera footage from soon after the shooting where Miller, while speaking to Hoffman, turned toward the back of the living room where a knife was visible, and stated: "That was the first one he threw at me." Miller BWC 19:32:55–19:33:00.

Absent a challenge to the authenticity or accuracy of this photo or video evidence, plaintiff has not created dispute of fact as to whether the decedent threw the first knife in Miller's direction. *See Scott*, 550 U.S. at 378 (finding no dispute of fact where plaintiff's version of events was contradicted by video evidence and plaintiff did not challenge the accuracy of the video).

Third, plaintiff argues that *Barnes* requires the Court to assess the extent to which Miller's earlier decision-making contributed to the threat of harm that he perceived when he used deadly force. Pl.'s Opp. at 18. Specifically, plaintiff urges the Court to consider: (1) Miller's decision to enter without waiting for backup, despite being aware that he may "stir" the situation by "barging in" alone; and (2) Miller's decision to remain in the residence, even after "it became clear that he was only further agitating [the decedent]." *Id.*

Plaintiff misreads *Barnes*. In *Barnes*, the Court explicitly declined to address "whether or how an officer's own 'creation of a dangerous situation' factors into the reasonableness analysis." *Barnes*, 605 U.S. at 74. Though plaintiff may be correct that Miller could have or even should have acted more prudently throughout the incident, the fact that a defendant's conduct fell short of best practices does not, by itself, create a genuine dispute of material fact as to the reasonableness of a challenged use of force. *See City & Cnty. of San Francisco, Calif. v. Sheehan*, 575 U.S. 600, 616 (2015) ("Even if an officer acts contrary to h[is] training, however, . . . that does not itself negate qualified immunity where it would otherwise be warranted."). Indeed, "[t]he qualified immunity standard 'gives ample room for mistaken judgments' by protecting 'all but the plainly incompetent or those who knowingly violate the law.'" *Hunter v. Bryant*, 502 U.S. 224, 229 (1991) (quoting *Malley v. Briggs*, 475 U.S. 335, 343, 341 (1986)).

Consequently, a "[plaintiff] cannot establish a Fourth Amendment violation based merely on bad tactics that result in a deadly confrontation that could have been avoided." *Sheehan*, at 615.

Fourth, plaintiff argues that, viewing the facts in the light most favorable to him, a reasonable jury could conclude that the decedent never approached or moved towards Miller in the moments before the fatal shots. Pl.'s Opp. at 15. According to plaintiff, the body worn camera footage depicting the decedent lying at the far end of the kitchen after the fatal shots creates a reasonable inference that the decedent had not advanced toward Miller. *See* Pl.'s Opp. at 8–9 (citing Miller BWC at 19:22:17). Plaintiff also relies on Miller's testimony that, throughout the whole interaction, he and the decedent remained approximately 15 feet apart. Miller Dep. at 153–54.

The Court agrees that, based on the circumstantial evidence and Miller's own testimony, a reasonable jury could find that the decedent had not approached Miller immediately prior to the fatal shots. After all, the Second Circuit has repeatedly stressed the need for courts to consider circumstantial evidence in cases where the sole surviving witness to a use of force is the defendant officer. *Callahan*, 96 F.4th at 369 n.9 (citing *O'Bert*, 331 F.3d at 37); *see also Soto*, 862 F.3d at 157.

Fifth, plaintiff argues that, because Miller's body worn camera was obstructed, there is no evidence to support Miller's self-serving assertion that the decedent threatened him with the second knife. Pl.'s Opp. at 15; *see* Miller Dep. at 153–54; Miller Decl. ¶ 16.

As an initial matter, plaintiff does not dispute that the decedent *obtained* a second knife. Plaintiff disputes only that the decedent threatened Miller with the second knife. *See* Pl.'s Resp. SMF ¶ 29 (disputing whether decedent approached Miller with the new knife drawn, but not the fact of the second knife).

The Court agrees with plaintiff.  Aside from Miller's own testimony, the only evidence to support Miller's assertion that the decedent pointed the second knife at him are his audible commands to the decedent to put the knife down in the seconds before the fatal shots.  Miller BWC at 19:22:01–03.  It is well-settled that "[t]he trier of fact need not accept a given witness's testimony even if it is uncontradicted." *Van Wie v. McHattie*, 122 F.3d 1058 (2d Cir. 1997).

This is particularly true where the witness is the defendant, and the jury may decide to discredit such testimony as self-serving.  *Kerman v. City of N.Y.*, 374 F.3d 93, 123 (2d. Cir. 2004) (noting that the jury is not required to accept the testimony or subjective representations of an interested witness).  Accordingly, construing the facts in the light most favorable to plaintiff, a reasonable jury could conclude that the decedent was not brandishing the knife towards Miller when he fired the fatal shots.

Lastly, for largely the same reasons, plaintiff disputes that the decedent refused Miller's command to put his hands up in the seconds prior to the fatal shots.  Pl.'s Resp. SMF ¶ 28 (denying that the decedent refused Miller's order because "there is no evidence of this other than Miller's account").

Unlike the previous example, where the only support for Miller's asserted fact was his own words, the decedent can be heard on Miller's body worn camera footage stating: "No" in immediate response to Miller's command to put his hands up.  Miller BWC at 19:21:43–45.  Although the decedent is not visible on the footage, the decedent's audible refusal to Miller's command corroborates Miller's testimony that the decedent did not comply with Miller's order to put his hands up, and plaintiff has not identified any evidence from which a reasonable jury could infer that the decedent had complied with Miller's command.

Having drawn all reasonable inferences in favor of plaintiff and resolved all ambiguities against Miller, the Court must now determine whether a reasonable officer in Miller's position would have understood either of Miller's uses of deadly force to be violative of the decedent's clearly established rights in light of then-existing precedent.

### ii.  Clearly Established Law

"Because qualified immunity is an affirmative defense, . . . 'the defendant[ ] bear[s] the burden of showing that the challenged act was objectively reasonable in light of the law existing at that time.'"  *Tellier v. Fields*, 280 F.3d 69, 84 (2d Cir. 2000) (quoting *Varrone v. Bilotti,* 123 F.3d 75, 78 (2d Cir.1997)

Miller cites several cases in support of his contention that his uses of deadly force were objectively reasonable under the existing case law at the time.  Def.'s Mem. at 12–14.  In opposition, plaintiff argues that the cases cited by Miller are distinguishable.  Pl.'s Opp. at 16.

The Supreme Court has "not yet decided what precedents—other than [its] own—qualify as controlling authority for purposes of qualified immunity," *District of Columbia v. Wesby*, 583 U.S. 48, 66 n.8 (2018); *see also Kisela*, 584 U.S. at 106 ("To begin with, 'even if a controlling circuit precedent could constitute clearly established . . . law in these circumstances, it does not do so here.'" (quoting *Sheehan*, 575 U.S. at 614)) (internal quotation marks omitted).  But the Court has indicated that a rule may be considered "clearly established" when it has a sufficiently clear foundation in "controlling authority or a robust consensus of cases of persuasive authority." *Wesby*, 583 U.S. at 589–90.

While the Supreme Court does "'not require a case directly on point' for a right to be clearly established, 'existing precedent must have placed the statutory or constitutional question beyond debate.'"  *White v. Pauly*, 580 U.S. 73, 79 (2017) (quoting *Mullenix*, 577 U.S. at 12).

- 17 -

"Such specificity is especially important in the Fourth Amendment context, where the Court has recognized that '[i]t is sometimes difficult for an officer to determine how the relevant legal doctrine, here excessive force, will apply to the factual situation the officer confronts.'" *Mullenix*, 577 U.S. at 12 (quoting *Saucier v. Katz*, 773 U.S. 194, 205 (2001)).

To be sure, in *Tennessee v. Garner*, the Supreme Court held that it is constitutionally unreasonable for an officer to use deadly force against a subject unless "the officer has probable cause to believe that the [subject] poses a threat of serious physical harm, either to the officer or to others." 471 U.S. 1, 11 (1985). In subsequent cases, the Supreme Court clarified that, outside of an obvious case, the deadly force standard set forth in *Garner* lacks the requisite specificity to constitute "clearly established law" for qualified immunity purposes. *See Brosseau v. Haugen*, 543 U.S. 194, 199 (2004); *Mullenix*, 577 U.S. at 12–13. Instead, "[t]he correct inquiry. . . [i]s whether it was clearly established that the Fourth Amendment prohibited the officer's conduct in the 'situation [he] confronted.'" *Mullenix*, 577 U.S. at 13 (quoting *Brosseau*, 543 U.S. at 199).

### a. Analysis

Miller argues that it was objectively reasonable for him to believe that his uses of deadly force did not violate the decedent's clearly established constitutional rights under then-existing law. Def.'s Mem. at 11–12. In support of this conclusion, Miller primarily relies on *Rose v. City of Utica*, where the court held that a defendant police officer was entitled to qualified immunity for using deadly force against an armed subject who: (1) fired a shotgun inside a public park; (2) did not react to the officer's commands to drop the shotgun; and (3) turned toward the officer while holding the shotgun. 2018 WL 2041621, at *10–11 (N.D.N.Y. Apr. 19, 2018), *aff'd,* 777 F. App'x 575 (2d Cir. 2019) (summary order).

Plaintiff maintains that the facts in *Rose* are dissimilar to the facts of this case, because, here, the decedent "was alone in his own apartment [and] was plainly suicidal and begging Miller to shoot and kill him."  Pl.'s Opp. at 16.  Plaintiff also notes that, "[t]o the extent [the decedent] threw a butter knife, this complied with [Miller]'s direction to give up the knife."  Pl.'s Opp. at 2.

It undisputed that the decedent did not comply with at least one of Miller's commands to drop the knife, *see* Pl.'s Add'l SMF ¶ 52, and as the Court determined, *supra*, all available evidence supports Miller's contention that the decedent threw the first knife *at him* or, at the very least, in his direction—not at the floor, in compliance with Miller's commands.  *See* Point IV.A.1.i.  In that regard, the facts in *Rose* are not dissimilar from those at issue here.  However, *Rose* is an unpublished district court decision, and the defendant officer in *Rose* confronted a subject who was firing a shotgun in a public park, which is markedly different than Miller's in-home interaction with the decedent, who was armed with a knife.

As for the other cases Miller cites, plaintiff concedes that "in several cases, [internal citations omitted], courts have found it objectively reasonable for a police officer to shoot a person who was approaching them with a knife or within 'lunging distance of them' with a knife."  Pl.'s Opp.  at 16–17.  But plaintiff maintains that, construing the facts in the light most favorable to him, a reasonable jury could find that the decedent neither approached nor threatened Miller with a knife, and under those circumstances, Miller's conduct was not objectively reasonable under then-existing law.  Pl.'s Opp. at 17.  Relying on extra-circuit precedents in varying procedural postures, plaintiff explains that:

> in other cases decided before 2021 and with fact patterns much closer to this one, our courts have not extended qualified immunity to law enforcement members. *Reyes v. Bridgwater,* 362 F. App'x 403,405,407 (5th Cir. 2010) (denying summary judgment to an officer who was alleged to have shot a suspect with a knife who was

standing "at a safe distance away from the officers" and "did not step forward towards the officers" or "raise the knife"); *Walker v. City of Orem,* 451 F.3d 1139, 1160 (10th Cir. 2006) (denying summary judgment to an officer who was alleged to have shot a suspect who was suicidal, was holding a knife to his own wrist, and "had made no threats and was not advancing on anyone"); *Zuchel v. City & Cty. of Denver,* 997 F.2d 730, 735-36 (10th Cir. 1993) (declining to set aside a jury finding of excessive force where there was evidence that an officer shot a suspect who was said to have a knife but "was not charging the officer and made no slicing or stabbing motions toward him"); *Reed v. City of Modesto,* 122 F. Supp. 3d 967, 981 (E.D. Cal. 2015) (declining to set aside a jury finding of excessive force where there was evidence that an officer shot a suspect with a knife . . . who was suicidal, "did not advance" towards the officers, "and was not making movements that threatened physical injury to anyone.").

*Id.* at 16–17.

In some cases, a consensus of persuasive authority can clearly establish the unconstitutionality of conduct sufficient to overcome a qualified immunity defense, but plaintiff has not identified such a consensus.

For one, the facts underlying *Reyes v. Bridgwater*, an unpublished Fifth Circuit decision, are distinguishable. 362 F. App'x 403 (5th Cir. 2010) (unpublished). There, the defendant police officer shot a man who was holding a knife in his apartment and had refused commands to drop it. *Id.* at 405. The parties in *Reyes* disputed whether the man had raised the knife before the officer fired the fatal shots. *Id.* Conversely, here, the body worn camera footage clearly captures the decedent raising the knife prior to Miller's initial use of deadly force. Miller BWC 19:21:10–12. Although the parties dispute whether the decedent raised a knife before Miller's *second* use of deadly force, it is undisputed that the decedent obtained a second knife less than a minute after throwing the first at Miller. In *Reyes*, the man had not previously raised or thrown a knife at the officer prior to the use of deadly force. These distinctions preclude *Reyes* from clearly establishing the unconstitutionality of Miller's uses of deadly force.

In addition, plaintiff claims that *Walker v. City of Orem*, a Tenth Circuit decision, clearly established the unconstitutionality of Miller's conduct. But the officer in *Walker* shot a man who

was over 21 feet away, holding a small knife to his wrist, and not facing the officer.  451 F.3d 1139, 1160 (10th Cir. 2006).  The Tenth Circuit's decision in *Zuchel v. City & Cnty. of Denver, Co.*, is similarly inapposite because, in that case, the excessive force claims were settled before trial.  997 F.2d 730, 733 (10th Cir. 1993) ("The Zuchels subsequently settled their claim against Officer Spinharney and the case proceeded to trial only on the claim against Denver.").

In any event, the Court need not ruminate over the persuasive effect of these extra-circuit authorities where controlling Supreme Court authority makes clear that, even under plaintiff's version of the facts, a reasonable officer in Miller's position would not have had reason to know that either use of deadly force violated the decedent's clearly established constitutional rights.

On October 18, 2021, the Supreme Court issued its decision in *City of Tahlequah, Okla. v. Bond*, which held that two police officers were entitled to summary judgment on qualified immunity grounds where the officers shot and killed a man who raised a hammer behind his head and took a stance as if he was about to throw the hammer or charge at the officers.  595 U.S. 9, 10–14 (2021).  The man was at least 6 feet away from the officers, and he had an unobstructed path to just one of the officers.  *Id.* at 11.  The Court found that qualified immunity was appropriate in the absence of "a single precedent finding a Fourth Amendment violation under similar circumstances."  *Id.* at 14.

If anything, the Court's decision in *City of Tahlequah* would have conveyed to a reasonable officer in Miller's position that his initial use of deadly force was not a Fourth Amendment violation.  Even accepting plaintiff's unsupported assertion that the decedent threw the first knife at the ground in an effort to comply with Miller's commands, the body worn camera footage shows that, like the defendants in *City of Tahlequah*, Miller fired within seconds of the decedent raising the knife over his head as if he was about to throw it or charge at Miller.

Accordingly, it was objectively reasonable for Miller to believe that his initial use of deadly force did not violate the decedent's clearly established rights in light of then-existing Supreme Court precedent, entitling him to qualified immunity.

The Supreme Court's reasoning in *City of Tahlequah* indicates that Miller is likely also entitled to qualified immunity for his second use of deadly force, but it is a closer call. On one hand, the parties do not genuinely dispute that the decedent obtained a second knife, had an unobstructed path to Miller, refused earlier commands to drop a knife and, unlike the man in *City of Tahlequah*, had raised and thrown a knife in Miller's direction less than a minute before the fatal use of force. On the other hand, crediting plaintiff's version of events, a reasonable jury could conclude that the decedent never pointed the second knife towards Miller.

This distinction is not fatal to Miller's qualified immunity defense, though. Looking beyond *City of Tahlequah*, a closer review of Supreme Court precedent in existence at the time of the incident reveals that it was nevertheless objectively reasonable for Miller to believe that his second use of force did not violate the decedent's clearly established constitutional rights.

In *Kisela*, decided three years before *City of Tahlequah*, the Supreme Court held that a defendant police officer was entitled to qualified immunity on summary judgment where the officer shot, but did not kill, a woman who was armed with a kitchen knife within 6 feet of a bystander. 584 U.S. at 101–02. In that case, officers had responded to reports that a woman was seen hacking at a tree with a knife and acting erratically. *Id.* at 105. Prior to the use of deadly force, the woman failed to acknowledge officers' commands to drop the knife at least twice, though there was record evidence that she did not hear those commands. *Id.* at 106. The decedent, here, was concededly 15 feet away from Miller at all relevant times, but, like the

woman in *Kisela*, he was armed with a knife and had refused commands to drop the knife prior to both uses of force.

Though neither *City of Tahlequah* nor *Kisela* explicitly ratified the reasonableness of Miller's second use of force, the qualified immunity inquiry does not ask whether then-existing precedent established the *constitutionality* of a particular course of conduct; rather, the dispositive inquiry is whether then-existing precedent placed the *unconstitutionality* of a particular course of conduct beyond debate. *See Berg v. Kelly*, 897 F.3d 99, 105 (2d Cir. 2018) (reversing district court's denial of qualified immunity "because then-existing law did not clearly establish the unconstitutionality of the challenged" conduct). Based on the Supreme Court's decisions in *City of Tahlequah* and *Kisela*, it cannot be said that the unconstitutionality of Miller's second use of deadly force was "beyond debate" as of December 22, 2021.

Then-existing Second Circuit decisions reflect a similar understanding. In *Estate of Jaquez by Public Administrator of Bronx County. v. City of New York*, the Second Circuit affirmed summary judgment in favor of defendant police officers on qualified immunity grounds where there was "no dispute that immediately prior to the officers' use of lethal force [the decedent] threatened the officers with a knife." 706 F. App'x 709, 715 (2d Cir. 2017) (summary order). The Second Circuit explained that, "because of [the decedent]'s refusal to follow commands, his close proximity to a lethal weapon, and his behavior up to that point, the arresting officers reasonably could have believed that [the decedent] posed a threat." *Id.* at 714–15; *see cf. O'Bert*, 331 F.3d at 40 (holding use of deadly force unreasonable where officer knew the decedent was unarmed and, thus, incapable of carrying out earlier threat to shoot officers).

As a final attempt to avoid this result, plaintiff claims that *Deorle v. Rutherford,* 272 F.3d 1272 (9th Cir. 2001) placed the unconstitutionality of Miller's conduct beyond debate. Pl.'s

Opp. at 15. In that case, according to plaintiff's characterization, the Ninth Circuit held that a defendant police officer was "not entitled to qualified immunity after he shot a mentally ill man who posed no threat to officers though he was plainly acting, as [the decedent] here, in a mentally distraught manner and had, unlike [the decedent], threatened physical force against the officers." Pl.'s Opp. at 15.

This case does not save plaintiff's claim. In 2015, the Supreme Court explicitly addressed *Deorle*, explaining that, "*Deorle* involved an officer's use of a beanbag gun to subdue 'an emotionally disturbed' person who 'was unarmed, had not attacked or even touched anyone, had generally obeyed the instructions given him by various police officers, and had not committed any serious offense.'" *Sheehan*, 575 U.S. at 614 (quoting *Deorle*, 272 F.3d at 1275). The Supreme Court's characterization of *Deorle* is fatal to its application to these facts. As explained *supra*, it is undisputed that the decedent was armed with a knife, had reportedly been in a physical altercation with Craft and Leblanc, refused Miller's initial command to drop the knife and, less than a minute before the fatal shots, raised a knife above his head and threw it in Miller's direction. As the Court stated in *Sheehan*, "the differences between that case and the case before us leap from the page." *Sheehan*, 575 U.S. at 614.

In fact, the Supreme Court distinguished *Deorle* again in *Kisela*:

> As for *Deorle,* this Court has already instructed the Court of Appeals not to read its decision in that case too broadly in deciding whether a new set of facts is governed by clearly established law . . . *Deorle* involved a police officer who shot an unarmed man in the face, without warning, even though the officer had a clear line of retreat; there were no bystanders nearby; the man had been "physically compliant and generally followed all the officers' instructions"; and he had been under police observation for roughly 40 minutes. [internal citation omitted]. In this case, by contrast, Hughes was armed with a large knife; was within striking distance of Chadwick; ignored the officers' orders to drop the weapon; and the situation unfolded in less than a minute.

*Kisela*, 584 U.S. at 106–07.

No rational factfinder could conclude, even based on the force of plaintiff's supportable circumstantial evidence, that Miller confronted circumstances at all similar to the defendant officer in *Deorle*, let alone similar enough to have placed the unconstitutionality of his conduct beyond debate.  Instead, the circumstances Miller reasonably perceived leading up to the fatal use of force most closely resembled those faced by the officers in *Kisela*: the decedent was armed with a knife and largely noncompliant with Miller's orders; the situation unfolded in a matter of minutes; and Miller warned the decedent at least once that he would deploy deadly force if the decedent failed to disarm himself.  Miller BWC at 19:18:53–57.

Because neither controlling Supreme Court authority, nor a consensus of persuasive authority, clearly established the unconstitutionality of Miller's conduct as of the date of the incident, Miller is entitled to qualified immunity.  The Court recognizes the difficult circumstances underlying this action, but is nevertheless constrained to grant defendant's motion on this basis.  Consequently, plaintiff's §1983 excessive force claim must be dismissed.

### B.  Remaining State Law Claims

The Court has dismissed plaintiff's sole federal claim, *see* supra Point IV.A.1.ii.a, leaving only plaintiff's state law negligence and battery claims against Miller, Compl. ¶¶ 33–53.  Miller contends that he is entitled to summary judgment on plaintiff's state law claims, but argues, alternatively, that the Court should decline to exercise supplemental jurisdiction over them. Def.'s Mem. at 14–15.  Plaintiff opposes summary judgment on his state law claims, but has taken no position as to whether the Court should exercise supplemental jurisdiction over them in the absence of a federal claim.  *See* Pl.'s Opp. at 20–22.

"[I]n the usual case in which all federal-law claims are eliminated before trial, the balance of factors . . .—judicial economy, convenience, fairness, and comity—will point toward declining to exercise jurisdiction over the remaining state-law claims." *Pension Ben. Guar.*

*Corp. ex rel. St. Vincent Catholic Med. Ctrs. Ret. Plan v. Morgan Stanley Inv. Mgmt. Inc.*, 712 F.3d 705, 727 (2d Cir. 2013); *Chinniah v. Fed. Energy Regul. Comm'n*, 62 F.4th 700, 703 (2d Cir. 2023) (holding same).

As Miller points out, the Second Circuit has endorsed this approach under similar circumstances. *Est. of Devine v. Fusaro*, 676 F. App'x 61 (2d Cir. 2017) (summary order) (affirming district court's decision to decline supplemental jurisdiction over state law wrongful death claims after granting summary judgment on qualified immunity as to excessive force claim); *see also Salim v. Proulx*, 93 F.3d 86 (2d Cir. 1996) (reversing district court's denial of summary judgment on qualified immunity as to excessive force claim and directing dismissal of state law claims on jurisdictional grounds).

Accordingly, the Court declines to exercise supplemental jurisdiction and dismisses plaintiff's state law negligence and battery claims, without prejudice to renewal in state court.

## V.     CONCLUSION

Therefore, it is

**ORDERED** that

1. Miller's motion for summary judgment is **GRANTED** as to plaintiff's §1983 excessive force claim; and

2. Plaintiff's remaining claims are **DISMISSED**, without prejudice to renewal in state court.

The Clerk of the Court is directed to:

a. Terminate the pending motion (Dkt. No. 53);

b. Enter a judgment accordingly, and close the file.

**IT IS SO ORDERED.**

- 27 -

Dated:  March 11, 2026
        Utica, New York.

Anthony J. Brindisi
U.S. District Judge